UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JACINTA GILLIS,

     Petitioner,

v.                                                    Case No. 8:20-cv-1596-MSS-SPF

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

**O R D E R**

     Gillis petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges her state court convictions for racketeering, money laundering, and conspiracy to traffic a controlled substance. (Doc. 1) After reviewing the petition (Doc. 1), the response (Doc. 11), the reply (Docs. 12 and 13), the supplemental briefs (Docs. 14, 18, 19, 21, 22, 54, 66, 69, and 71), and the relevant state court record (Docs. 11-2, 11-3, and 37), the Court **DENIES** the petition.[1]

**PROCEDURAL HISTORY**

     A jury found Gillis guilty of racketeering, conspiracy to commit racketeering, two counts of money laundering, and conspiracy to traffic a controlled substance. (Doc. 11-2 at 3191–95, 3254, 3256, 3258, and 3260) The trial court determined that the racketeering conspiracy conviction merged into the racketeering conviction (Doc. 11-2 at 3327) and sentenced Gillis to thirty years in prison for the drug trafficking conspiracy conviction and

---

[1] Because the Court denies the petition, Gillis's motion (Doc. 77) for clarification, motion (Doc. 79) to compel a ruling, and "emergency" motion (Doc. 82) for release are **DENIED** as moot.

thirty years of probation for all remaining convictions. (Doc. 11-2 at 3327–28) Gillis appealed, and the state appellate court affirmed. *Gillis v. State*, 275 So. 3d 576 (Fla. 2d DCA 2019) (table).

The post-conviction court denied Gillis relief without an evidentiary hearing (Doc. 11-3 at 358–61), and the state appellate court affirmed. *Gillis v. State*, 301 So. 3d 921 (Fla. 2d DCA 2020) (table). The state appellate court denied Gillis's two petitions alleging ineffective assistance of appellate counsel (Doc. 11-3 at 168, 574) and her petition for a writ of habeas corpus collaterally attacking her convictions and sentences. (Doc. 11-3 at 713) Gillis's federal petition follows.

## FACTS

In January 2019, law enforcement received tips about illegal activity at the Dollar Medical Clinic in Pinellas County, Florida. (Doc. 11-2 at 937, 940) A detective learned that patients traveled from as far as Citrus County and Volusia County for treatment at Dollar Medical. (Doc. 11-2 at 938–40, 1049) The detective began to investigate by interviewing patients and surveilling the clinic. (Doc. 11-2 at 938, 941) In the morning, the clinic's parking lot filled with cars, and patients lined up outside the clinic. (Doc. 11-2 at 941) Patients exited the clinic with prescriptions and walked to a pharmacy located in the same shopping center. (Doc. 11-2 at 942) A black car, registered to Gillis, parked in front of the clinic. (Doc. 11-2 at 954–55) Around 3:00 P.M. or 4:00 P.M., Gillis left, and the parking lot emptied. (Doc. 11-2 at 959–70) Another detective installed a camera on a pole outside a Dollar Medical in Lee County. (Doc. 11-2 at 1066) When the black car, registered to Gillis, parked in front of the clinic, a steady flow of patients entered the clinic and exited with prescriptions. (Doc. 11-2 at 1067–69)

An undercover detective went to the clinic in Pinellas County, and two other undercover detectives went to the clinic in Lee County. In Pinellas County, the detective paid $225.00 in cash and waited about four and a half hours to meet with Gillis. (Doc. 11-2 at 1105–13) An assistant measured the detective's heart rate and blood pressure and asked about his medical history. (Doc. 11-2 at 1107–08) The detective claimed that six years earlier he fell off a scaffold and injured his lower back and right knee. (Doc. 11-2 at 1115) The detective showed Gillis a fraudulent MRI and fraudulent documents from a pharmacy listing medication that a doctor had prescribed him. (Doc. 11-2 at 1115) Gillis did not ask the detective to change into a gown, did not physically manipulate any painful areas on the detective's body, and only asked him to complete simple physical tasks. (Doc. 1116–17) Gillis prescribed him 120 methadone pills, 150 oxycontin pills, thirty Valium pills, and other medication. (Doc. 11-2 at 1118, 1121–23) Gillis did not explain the dangers of the medication. (Doc. 11-2 at 1118–19) The detective filled the prescription at the pharmacy nearby and placed the drugs into an evidence locker. (Doc. 1124–29)

The detective returned to Dollar Medical every thirty days for three months. During those appointments, he paid $125.00 in cash, complained about pain, and received more prescriptions for methadone and oxycodone. (Doc. 11-2 at 1130–38, 1150–58, 1160–61) During those appointments, Gillis did not ask the detective to change into a gown, did not physically manipulate any painful areas on the detective's body, and did not ask for a urine sample to screen for drug abuse. (Doc. 11-2 at 1133–34, 1158, 1177) The detective filled the prescriptions and placed the drugs into an evidence locker. (Doc. 11-2 at 1136–38, 1150–54, 1161)

The detective returned for a fifth appointment, paid $125.00 cash, met with Gillis, briefly discussed his pain, and received another prescription for oxycodone and methadone. (Doc. 11-2 at 1178–80) The detective asked Gillis if she would prescribe pain medication for the detective's girlfriend, who broke her tooth, and Gillis refused unless his girlfriend paid $125.00. (Doc. 11-2 at 1179–80, 1187)

The detective returned for a sixth appointment, paid $125.00 cash, and observed in his patient file two prescriptions for oxycodone and methadone signed by Gillis but without a name or date of birth. (Doc. 11-2 at 1189–90) The detective told Gillis that he ran out of pain pills because his girlfriend, who broke her tooth, took some pills to manage her pain. (Doc. 11-2 at 1192) Gillis told the detective that he had violated the clinic's rules, warned him, "Don't let it happen again," and prescribed him more oxycodone and methadone. (Doc. 11-2 at 1192–93, 1198) A male at the front desk filled out the name and date of birth on the prescriptions and gave the prescriptions to the detective. (Doc. 11-2 at 1192–93) Gillis never asked the detective if he abused drugs. (Doc. 11-2 at 1250)

Another undercover detective visited Dollar Medical in Lee County, paid $125.00 in cash, and waited about two hours in the waiting room. (Doc. 11-2 at 1329) The patients in the waiting room appeared under the influence of narcotics. (Doc. 11-2 at 1331) The undercover detective met with Gillis for about seven minutes, told her that he suffered pain from a dislocated shoulder, complained that he could not sleep, and admitted that he illegally purchased "Roxicodone" to manage the pain. (Doc. 11-2 at 1333, 1334–35, 1338) Gillis asked if he was buying them or getting them from friends, and the detective responded, "Yes. Not only am I getting them from my friends, but I'm also purchasing them illegally on the streets, and I want[ ] to do it the correct way." (Doc. 11-2 at 1333)

Gillis did not ask the detective to put on a gown, did not physically manipulate painful areas on the detective's body, and only asked him to complete simple physical tasks. (Doc. 11-2 at 1336) The detective completed the tasks without pretending that he was in pain but described his pain level as eight out of ten. (Doc. 11-2 at 1335–36) The detective gave Gillis a fake MRI from Pennsylvania, and Gillis told him that he would have to obtain an MRI from a provider in Florida. (Doc. 11-2 at 1335) Gillis prescribed the detective oxycodone, Valium, and other medication. (Doc. 11-2 at 1337) Less than thirty days later, the detective returned to the clinic, paid $125.00 in cash, and provided a real MRI that he had obtained. (Doc. 11-2 at 1341–42) Gillis reviewed the MRI, stated that the detective had scoliosis, which the detective knew about, and two herniated discs, which the detective did not know about. (Doc. 11-2 at 1342) The detective told Gillis that he was feeling well. (Doc. 11-2 at 1343) Gillis prescribed him the same pain pills as the last visit. (Doc. 11-2 at 1343–45)

A few months later, an assistant at the clinic refused to schedule an appointment for the detective because the assistant believed that police had arrested the detective for drug possession. (Doc. 11-2 at 1348–49) After the detective showed the assistant that police had arrested a different person with his same name, the assistant agreed to schedule an appointment but warned that the doctor may require a drug test. (Doc. 11-2 at 1349–50) At the appointment, the detective paid $125.00 in cash and $30.00 for a drug test, and an assistant administered the test by placing a cotton swab between the detective's teeth and gums. (Doc. 11-2 at 1351) The detective met with "the other Dr. Gillis," Gillis's father, who asked the detective about his level of pain. (Doc. 11-2 at 1353) The detective said that his pain remained the same before and after taking the pain pills. (Doc. 11-2 at 1353) Gillis's father asked the same question, and the detective gave the same answer. (Doc. 11-2 at 1353) Gillis's father

asked the question a third time, and the detective described his pain level as four out of ten before taking the pills and stated that the level dropped after taking the pills. (Doc. 11-2 at 1354) Gillis's father replied, "That's the answer that I needed to hear." (Doc. 11-2 at 1354) The detective met with Gillis, who prescribed more oxycodone and Valium. (Doc. 11-2 at 1355–56)

A third undercover detective visited the Dollar Medical in Lee County, paid $125.00 in cash, filled out paperwork, and complained about shoulder and back pain. (Doc. 11-2 at 1395–98) An assistant weighed the detective, measured his temperature and blood pressure, and asked him about his pain. (Doc. 11-2 at 1401–02) The detective described his pain level as four out of ten. (Doc. 11-2 at 1401–02) The detective waited five hours for his appointment. (Doc. 11-2 at 1401–02) Staff at the clinic served patients in the waiting room hamburgers and hot dogs. (Doc. 11-2 at 1403–04)

The detective told Gillis that he took Percocet while recovering from knee surgery. (Doc. 11-2 at 1406) During the appointment, Gillis did not ask the detective to put on a gown, did not physically manipulate painful areas on the detective's body, and only asked him to complete several simple physical tasks. (Doc. 11-2 at 1404–05) The detective completed the tasks, and Gillis commented, "Oh, I see you're in pain." (Doc. 11-2 at 1405) When Gillis said she would prescribe methadone, the detective asked if he could get oxycodone, and Gillis replied, "This isn't a supermarket." (Doc. 11-2 at 1407) Gillis wrote a prescription for methadone and two other medications, paused, and wrote a prescription for oxycodone. (Doc. 11-2 at 1407–08) Gillis did not discuss the danger of taking both methadone and oxycodone and did not discuss any alternative treatment. (Doc. 11-2 at 1408–09) An assistant at the front desk filled out the detective's name on the prescription. (Doc. 11-2 at 1409–10)

Less than a month later, the detective returned for a second visit, paid cash for the visit, and described his pain level as three or four out of ten. (Doc. 11-2 at 1429–30, 1436) Gillis did not physically manipulate any painful areas on the detective's body and did not ask for an MRI. (Doc. 11-2 at 1430) Gillis prescribed more methadone and oxycodone. (Doc. 11-2 at 1430–31) Gillis post-dated the second prescription to ensure that the detective received the second prescription thirty days after the first prescription. (Doc. 11-2 at 1431)

A chemist counted, weighed, and tested some of the pills that the detectives obtained with prescriptions from Gillis. (Doc. 11-2 at 2068) The chemist counted (1) 601 pills of oxycodone, a Schedule II controlled substance, weighing 75.8 grams, (2) 120 pills of Valium, a Schedule IV controlled substance, weighing 21.0 grams, and (3) 630 pills of methadone, a Schedule II controlled substance, weighing 144.2 grams. (Doc. 11-2 at 2068–78)

Fourteen patients testified at trial. The fourteen patients paid cash at Dollar Medical, never took a urine test to screen for drug abuse, and received prescriptions from Gillis for high doses of oxycodone or methadone. (Doc. 11-2 at 1647, 1649, 1667–69, 1684–86, 1700–02, 1720–24, 1732–39, 1752–55, 1768, 1781–85, 1807, 1872–75, 1892, 1898–99, 1917–18, 2121–25) Before seeking treatment, five patients had unlawfully obtained pain pills from family, friends, or other persons. (Doc. 11-2 at 1645, 1665, 1732, 1890, 1915) Many patients received a prescription for oxycodone once or twice without seeing Gillis. (Doc. 11-2 at 1652, 1686, 1706, 1725, 1755, 1785, 1878, 1919, 2124) Most patients became addicted to oxycodone and suffered severe withdrawals when they stopped taking the pain pills. (Doc. 11-2 at 1651–52, 1672–75, 1725–26, 1740–41, 1759–60, 1787, 1808, 1876, 1901) One patient had track marks on his body from prior illegal intravenous drug use, and Gillis never examined his body for track marks. (Doc. 11-2 at 2120, 2126–28)

7

Detectives obtained warrants to search the clinic in Pinellas County, the clinic in Lee County, and Gillis's home in Lee County. (Doc. 11-2 at 979–80) The prosecutor's office reviewed 167 patient files seized during the searches and created a spreadsheet containing the patient's name, the dates of appointments, the location of the appointments, the pain level reported by the patient, and the medication prescribed. (Doc. 11-2 at 2327, 2330–31) A crime laboratory analyst examined eight computers seized by the detectives. (Doc. 11-2 at 2672–73, 2677–78) Data on one of the computers showed searches on Google for the following: (1) "How much money can be deposited into a bank when you don't have a job," (2) "What is the max amount you can deposit without the IRS finding out," and (3) "Oxycontin order by bulk." (Doc. 11-2 at 2718–27) A data analyst with the National Drug Intelligence Center obtained records from seventeen pharmacies between June 17, 2008, and December 30, 2010, and identified 33,581 prescriptions signed by Gillis, including 17,438 prescriptions for oxycodone (2,638,512 total pills), 4,368 prescriptions for methadone (644,946 total pills), and 5,236 prescriptions for Valium. (Doc. 11-2 at 2095–98) Gillis prescribed this medication to 2,151 patients. (Doc. 11-2 at 2102)

An investigator with Perdue Pharma, which manufactures Oxycontin and manages a program that provides the medicine to patients who cannot afford the medicine, received complaints that Gillis inappropriately prescribed the pain medicine. (Doc. 11-2 at 2171) The investigator discovered that many patients traveled long distances to seek treatment from Gillis, that Gillis prescribed the highest strength pills to her patients, and that Gillis had the highest number of patients in the assistance program in the country. (Doc. 11-2 at 2172–75) After learning about Gillis's practice, Perdue Pharma refused to accept prescriptions from Gillis for the assistance program. (Doc. 11-2 at 2175–76)

While executing the search warrant at Dollar Medical in Pinellas County, a detective interviewed Gillis. (Doc. 11-2 at 2431) Gillis claimed that Dollar Medical earned about $5,000.00 to $7,000.00 a day in cash and that her annual income from Dollar Medical totaled $80,000.00 to $100,000.00. (Doc. 11-2 at 2444) She purchased with cash a Chrysler, a Hummer, an Avalanche, and a Wrangler. (Doc. 11-2 at 2458–60) She bought her home with cash because she did not qualify for a mortgage. (Doc. 11-2 at 2498–2500) She accepted only cash from patients because health insurance companies did not want to pay for her services and credit card companies charged a fee. (Doc. 11-2 at 2478–79) She met with forty or fifty patients a day. (Doc. 11-2 at 2480) If a patient came to the clinic when Gillis was away, Gillis met with the patient by video conference. (Doc. 11-2 at 2483) Gillis regularly wrote prescriptions for patients after reviewing patient files and instructed her assistant to fill out the name of the patient on the prescription. (Doc. 11-2 at 2485–88) She claimed that even though many of the patient files contained prescriptions already signed by Gillis, Gillis always met with the patient before the patient received the prescription. (Doc. 11-2 at 2542–43)

Gillis described Dollar Medical as a pain management clinic that treated patients with incurable chronic pain. (Doc. 11-2 at 2518–19) She claimed that if a patient was dependent on pain medication, she showed the patient how to correctly take long-lasting pain medication to minimize pain. (Doc. 11-2 at 2522–25) Gillis claimed that about twenty-five percent of her patients suffered from cancer. (Doc. 11-2 at 2527)

Gillis hired a friend, whom she met in college, to manage the Dollar Medical in Lee County. (Doc. 11-2 at 1470–71) Even though her friend lacked any training in medicine, her friend weighed patients, measured their blood pressure, and asked about their pain. (Doc. 11-2 at 1471–73) When Gillis was not at the clinic, her friend set up a video conference on

the computer between the patient and Gillis. (Doc. 11-2 at 1504–06) After the conference, the patient received the prescription, which was already filled out. (Doc. 11-2 at 1507–08) When the video conference did not work, the patient still received the prescription. (Doc. 11-2 at 1508–09) Her friend expressed concern about some patients receiving pain medication, and Gillis responded, "She was the doctor." (Doc. 11-2 at 1514)

Gillis hired a driver who drove her from Lee County to the Dollar Medical in Pinellas County, counted the cash at the clinics, and paid the other employees at the clinics. (Doc. 11-2 at 1553, 1555–56, 1560, 1562) The driver separated the cash into one-thousand-dollar bundles, gave Gillis the bundles of cash at the end of the day, and told her how many patients had paid for appointments. (Doc. 11-2 at 1557–58) Gillis hired a scheduler who answered telephones and scheduled at least four patients for every hour that the clinic was open. (Doc. 11-2 at 1582–83) Gillis hired a security guard who wrote the name of the patient and the patient's date of birth on the prescription at the end of an appointment and scheduled a new appointment. (Doc. 11-2 at 1601) The security guard remembered at least six patients who received a prescription when Gillis was not at the clinic. (Doc. 11-2 at 1606–07) Also, if a prescription was not in the patient's file and Gillis was not at the clinic, an employee obtained a signed, filled prescription that Gillis kept in her desk. (Doc. 11-2 at 1608–09) The security guard once told Gillis that patients in the waiting room appeared intoxicated, and Gillis responded, "Let me be the judge of that. I'm the doctor." (Doc. 11-2 at 1598–99)

Several years before the investigation into Dollar Medical, law enforcement investigated the owner of a pain management clinic in Pinellas County where Gillis worked. (Doc. 11-2 at 1260–61) Gillis twice prescribed an undercover detective oxycodone after weighing the detective, measuring his blood pressure, and asking him to perform simple

10

physical tasks. (Doc. 11-2 at 1268–71, 1274–77) Gillis cooperated with law enforcement in the investigation, told the detective that the owner of the clinic offered her $225,000.00 a year if she wrote prescriptions "as needed," and said that many patients came to the clinic for treatment that they did not need. (Doc. 11-2 at 1279–83) The detective told Gillis what she was doing was wrong, and Gillis responded that she planned to correct her actions by opening her own clinic, accepting patients only forty and older, and taking steps to identify fake MRIs. (Doc. 11-2 at 1283–84)

A financial analyst reviewed records for four bank accounts belonging to Gillis and three bank accounts belonging to Dollar Medical. (Doc. 11-2 at 2599) In 2009, Gillis deposited $736,836.00 in cash in the seven bank accounts. (Doc. 11-2 at 2618) During that year, Gillis spent significant amounts of money on airline tickets, clothing, jewelry, hotels, and furniture. (Doc. 11-2 at 2607–18) From January 2010 to September 2010, Gillis deposited $589,131.00 in cash in the seven bank accounts. (Doc. 11-2 at 2628–29) During those months, Gillis spent money on airline tickets, clothing, jewelry, hotels, tickets for events, two cars, a house, and a yacht that she chartered. (Doc. 11-2 at 2619–41) Gillis purchased the house for $390,000.00 in cash by wiring the money to a title company in two payments. (Doc. 11-2 at 2222–27)

A bank teller testified that Gillis, a customer at the bank where the teller worked, regularly deposited large amounts of cash. (Doc. 11-2 at 2141, 2309–13) The teller once received sixteen deposits from Gillis in one day ranging from $2875.00 to $10,000.00. (Doc. 11-2 at 2152–53) Under those circumstances, the bank's computer system did not automatically generate a large currency transaction report to alert the federal government to potential money laundering activity. (Doc. 11-2 at 2312–13)

A mortgage loan officer who attempted to secure Gillis a mortgage became concerned when Gillis told her that she had between $125,000.00 and $250,000.00 in cash in a safety deposit box for a down payment. (Doc. 11-2 at 2201–02) The officer asked for documents showing that Gillis earned the cash as income. (Doc. 11-2 at 2202) Gillis's accountant provided documents contradicting what Gillis had told the officer. (Doc. 11-2 at 2204–05) The lender denied Gillis's mortgage application. (Doc. 11-2 at 2205)

A pharmacist testified that oxycodone and methadone are Schedule II pain medications. (Doc. 11-2 at 2736–37) Prescribing both oxycodone and methadone at the same time will result in drowsiness and respiratory depression. (Doc. 11-2 at 2739) A doctor should not keep blank prescriptions already signed by the doctor because a patient may steal the signed paper and forge a prescription. (Doc. 11-2 at 2756–57) Prescribing 270 thirty-milligram oxycodone pills in one month, or nine pills a day, is dangerous because consuming eighty milligrams of oxycodone in one day is a lethal dose for a patient who has never taken oxycodone. (Doc. 11-2 at 2759–60)

An anesthesiologist, board certified in pain management, who had owned a pain management clinic, testified that a doctor should initially meet with a patient who seeks treatment for pain for forty-five minutes to an hour. (Doc. 11-2 at 2786) The doctor should require the patient to dress in a gown to facilitate both an examination the patient's body and physical manipulation of areas where the patient experiences pain, should ask about the patient's medical history, should obtain prior imaging and medical records, should assess the patient's mental health, and should administer a drug test to screen for drug abuse. (Doc. 11-2 at 2786–93) If a doctor initiates treatment with opioids, the doctor must prescribe the lowest possible dose for two weeks. (Doc. 11-2 at 2789) The doctor described as dangerous

the practice of meeting with a patient by video conference if the patient is prescribed high doses of opioids. (Doc. 11-2 at 2828) The doctor had never signed a prescription for a controlled substance without writing a patient's name on the prescription because that practice violates federal law. (Doc. 11-2 at 2844)

If a patient reported abusing opioids, the doctor did not prescribe opioids to the patient. (Doc. 11-2 at 2795–96) The doctor used either a "urine dip" or laboratory testing for drug testing and had never heard of drug testing with an oral swab. (Doc. 11-2 at 2803–04) The doctor generally re-evaluated a patient four times a year. (Doc. 11-2 at 2798–99) The doctor allowed a medical assistant to give a patient a prescription only if the patient needed a prescription in an emergency. (Doc. 11-2 at 2806) If the doctor was in the office, the doctor always met with the patient before giving a prescription. (Doc. 11-2 at 2806) During a regular busy day, the doctor normally met with six or seven new patients and ten patients for follow-up appointments. (Doc. 11-2 at 2806) The doctor was able to operate a profitable clinic even though he treated patients who paid with insurance. (Doc. 11-2 at 2812)

The doctor did not prescribe oxycodone, methadone, and Valium together because taking the three medicines together is dangerous. (Doc. 11-2 at 2819–20) The doctor prescribed very high doses of opiates only to patients who were dying in hospice. (Doc. 11-2 at 2814–15) If a patient reported that he ran out of a prescription for oxycodone, the doctor ordered a urine test to screen for drug abuse, required the patient to return to the clinic weekly, and decreased the prescription dramatically. (Doc. 11-2 at 2827)

The doctor reviewed the 167 patient files seized from Dollar Medical, reviewed a spreadsheet containing relevant data, and viewed video recordings of the undercover detectives' appointments with Gillis. (Doc. 11-2 at 2822–24) The doctor opined that Gillis

prescribed medication outside the course of ordinary practice. (Doc. 11-2 at 2895–96) The
patient files revealed that Gillis prescribed high doses of pain medication, operated a high-
volume clinic, kept deficient medical records, and provided deficient treatment. (Doc. 11-2 at
2896) After reviewing the 167 patient files, the doctor identified one patient, who suffered
from lung cancer and "end-stage" chronic obstructive pulmonary disease, whom the doctor
would have prescribed the same medication. (Doc. 11-2 at 2895)

**STANDARDS OF REVIEW**

**AEDPA**

Because Gillis filed her federal petition after the enactment of the Antiterrorism and
Effective Death Penalty Act, AEDPA governs her claims. *Lindh v. Murphy*, 521 U.S. 320,
327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not
> be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of
> the claim —
>
> (1)    resulted in a decision that was contrary to,
>        or involved an unreasonable application
>        of, clearly established Federal law, as
>        determined by the Supreme Court of the
>        United States; or
>
> (2)    resulted in a decision that was based on an
>        unreasonable determination of the facts in
>        light of the evidence presented in the State
>        court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives
at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law
or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of
materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision

involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Clearly established federal law refers to the holding of an opinion by the U.S. Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Gillis asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984), explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court

deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).

Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

In a decision without a written opinion, the state appellate court affirmed the order denying Gillis post-conviction relief. *Gillis*, 301 So. 3d at 921. A federal court "'look[s] through' the unexplained decision to the last related state-court decision that does provide

a relevant rationale [and] presume[s] that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Because the post-conviction court provided reasons for denying Gillis's claims in a written order (Doc. 11-3 at 358–61), this Court evaluates those reasons under Section 2254(d).

**Exhaustion and Procedural Default**

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay — or dismiss without prejudice — a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim on a state procedural ground, the federal court denies the claim as procedurally defaulted. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

Also, "a state court's rejection of a federal constitutional claim on procedural grounds will [ ] preclude federal review if the state procedural ruling rests upon [an] 'independent and adequate' state ground." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (citing *Coleman*, 501 U.S. at 729–30). A state court's procedural ruling rests on an independent and adequate state ground if (1) the last state court reviewing the federal claim

clearly and expressly relies on a state procedural rule to resolve the claim without reaching

the merits of the claim, (2) the state court's decision rests solidly on state law grounds and

is not intertwined with an interpretation of federal law, and (3) the state procedural rule is

not applied in an "arbitrary or unprecedented fashion," or in a "manifestly unfair" manner.

*Judd*, 250 F.3d at 1313 (citing *Card v. Dugger*, 911 F.2d 1494, 1516–17 (11th Cir. 1990)).

To excuse a procedural default on federal habeas, a petitioner must demonstrate

either (1) cause for the default and actual prejudice from the alleged violation of federal law

or (2) a miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547

U.S. 518, 536–37 (2006).

## ANALYSIS

### Ground One

Gillis asserts that the trial court violated her Fourth Amendment right against

unreasonable searches and seizures by admitting evidence unlawfully seized by police

during a search of her clinics, her home, and a bank where she kept money. (Doc. 2 at

9–10) She contends that police relied on a search warrant not supported by probable cause.

(Doc. 2 at 9–10)

The Respondent asserts that the claim is procedurally barred because Gillis failed to

exhaust her remedies in state court. (Doc. 11 at 13–14) In her brief on direct appeal, Gillis

did not raise the Fourth Amendment claim. (Doc. 11-3 at 58–72) Gillis raised the claim in

her motion for post-conviction relief (Doc. 11-3 at 223–26), and the post-conviction court

denied the claim as procedurally barred (Doc. 11-3 at 360):

> . . . Defendant alleges that law enforcement obtained a search
> warrant "under false pretense resulting in illegal search and
> seizure." Specifically, she alleges that law enforcement made
> false statements and forged the necessary paperwork to obtain

> a search warrant. A claim that a defendant's right to be free from unreasonable searches and seizures was violated by the use of an illegal search warrant is not cognizable in a Rule 3.850 motion. *Suggs v. State*, 923 So. 2d 419, 439 (Fla. 2005). Therefore, this claim is denied.

*Suggs v. State*, 923 So. 2d 419, 439 (Fla. 2005), affirmed a post-conviction court's order denying a Fourth Amendment claim as procedurally barred because "[a]ny challenge to the denial of the motion to suppress should have been raised on direct appeal." *See* Fla. R. Crim. P. 3.850(c) ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence.").

Because the post-conviction court denied the claim on an independent and adequate state law ground, the claim is procedurally barred. *LeCroy v. Sec'y, Fla. Dep't Corrs.*, 421 F.3d 1237, 1260 n.25 (11th Cir. 2005) ("This Court has already concluded that the procedural requirements of Florida's Rule 3.850 constitute independent and adequate state grounds under the applicable law.") (citing *Whiddon v. Dugger*, 894 F.2d 1266, 1267–68 (11th Cir. 1990)).

Gillis asserts that appellate counsel deficiently performed by failing to raise the Fourth Amendment claim on direct appeal. (Doc. 1 at 5) "Ineffective assistance of counsel . . . is cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). However, "[b]efore a habeas petitioner can rely on an allegation of ineffective assistance of counsel to demonstrate cause to excuse a procedural default, he must show that he properly raised the argument in state court, because ineffective assistance is itself a constitutional claim." *Ledford v. Warden, Ga. Diag. Prison*, 975 F.3d 1145, 1161 (11th Cir. 2020) (citing *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000)).

Gillis raised the claim in a petition alleging ineffective assistance of appellate counsel (Doc. 11-3 at 475–76, 530–34), and the state appellate court dismissed the petition as successive. (Doc. 11-3 at 574) Fla. R. App. P. 9.141(d)(6)(C) ("The court may dismiss a second or successive petition if it does not allege new grounds and the prior determination was on the merits, or if a failure to assert the grounds was an abuse of procedure."). Because the state appellate court dismissed the claim on an independent and adequate state law ground, appellate counsel's deficient performance does not serve as cause to excuse a procedural default. *Ledford*, 975 F.3d at 1163.

Because Gillis fails to demonstrate either cause and prejudice or manifest injustice to excuse the procedural default, the claim is procedurally barred from federal review. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37.

Ground One is **DENIED**.

**Ground Two and Ground Seven**

In Ground Two, Gillis asserts that the trial court violated her Fifth Amendment right against double jeopardy. (Doc. 2 at 11–12) She contends that the prosecutor vindictively pursued criminal charges after an administrative law judge determined that she acted in good faith and within the course of professional practice. (Doc. 2 at 11)[2]

In Ground Seven, Gillis asserts that the trial court violated her federal right to due process and equal protection because the trial court lacked subject matter jurisdiction over the prosecution. (Doc. 2 at 26–28) She contends that the complaints amounted to medical

---

[2] In Ground Two, Gillis further asserts that the trial court violated her Sixth Amendment right to counsel by dismissing her appointed counsel just before trial. (Doc. 1 at 7) Gillis also raises this claim in Ground Five of her federal petition. (Doc. 2 at 20–22) The Court addresses the claim below in Ground Five.

malpractice. (Doc. 2 at 26–27) She asserts that, because an administrative law judge already determined that she acted in good faith and within the course of professional practice, her criminal case was moot. (Doc. 2 at 27–28)

The Respondent asserts that the double jeopardy claim in Ground Two is procedurally barred because Gillis failed to exhaust her remedies in state court. (Doc. 11 at 16) Gillis failed to raise the double jeopardy claim in her brief on direct appeal. (Doc. 11-3 at 58–72) However, Gillis raised the claim in her motion for post-conviction relief (Doc. 11-3 at 194–98), and the post-conviction court adjudicated the claim on the merits. (Doc. 11-3 at 360) Also, Gillis raised the claim in her *pro se* brief on post-conviction appeal. (Doc. 11-3 at 427–29) *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Because Gillis invoked one complete round of the state's established appellate review process, Gillis exhausted the claim. *Boerckel*, 526 U.S. at 845. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("If an earlier opinion 'fairly appear[s] to rest primarily upon federal law,' we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place.").

The post-conviction court denied the double jeopardy claims in Ground Two and Ground Seven as follows (Doc. 11-3 at 359–60) (state court record citations omitted):

> . . . Defendant alleges that the Court lacked subject matter jurisdiction and violated her "right to be free from twice jeopardy." She alleges that the Court lacked subject matter jurisdiction because it was an inadequate forum to decide the issues of medical ethics and professionalism inherent in her conduct. Additionally, she alleges that because, in 2012, an administrative law judge recommended that her medical license be reinstated, the State could not prosecute her. First, a circuit court has jurisdiction over a case when the State's information charges felony offenses. *Carbajal v. State*, 75 So. 3d 258, 262 (Fla. 2011). The information in this case charged felony offenses, so the Court had jurisdiction. Second, the prohibition

against double jeopardy does not apply to bar a criminal prosecution after a license revocation proceeding based on the same or similar facts. *See State v. Bowling*, 712 So. 2d 798 (Fla. 2d DCA 1998) (contractor's license and subsequent criminal proceeding based on same facts); *Borrego v. Agency for Health Care Admin.*, 675 So. 2d 666 (Fla. 1st DCA 1996) (medical license revocation based on criminal conviction for same conduct). Because the prior proceeding was not a criminal proceeding, it did not bar the prosecution in this case. Therefore, this claim is denied.

Whether the trial court lacked subject matter jurisdiction over the prosecution is an issue of state law, and a claim based on a violation of state law is not cognizable on federal habeas. 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988) ("This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is 'couched in terms of equal protection and due process.'") (citation omitted).

The third amended information charged Gillis with felony crimes, including racketeering, conspiracy to commit racketeering, money laundering, and conspiracy to traffic a controlled substance. (Doc. 11-2 at 339–416) The trial court had "exclusive original jurisdiction" over "all felonies and [ ] all misdemeanors arising out of the same circumstances as a felony which is also charged." § 26.012(2)(d), Fla. Stat. Because the trial court had subject matter jurisdiction over the felony prosecution, the post-conviction court did not unreasonably deny the claim.

In her post-conviction motion, Gillis summarized the administrative proceedings as follows (Doc. 11-3 at 195):

> The State ignored [the] fact[ ] [that] these issues were addressed and resolved at [the] end of Dr. Gillis's administrative law trial in late 2012 where [the] State originally presented [the] case with [the] same claims [ ] before an administrative law judge during a one-week trial. After testimony by law enforcement,

undercovers posing as patients, [and] expert witnesses, the administrative law judge ruled that Dr. Gillis practiced in "good faith and within the course of a professional practice and no trick or schemes were noted to exist." Reinstatement was recommended of her medical license. All allegations were to be dropped and case closed. However, instead, the State just took [the] same issues and [the] same case and resubmitted and retried Dr. Gillis in criminal court in October 2015, because the administrative judge didn't agree with [the] State. The State cannot keep presenting [the] same case and claim over and over until a judge or jury agrees with them. Good faith and within the course of a professional practice are standard of care issues which are dealt with as civil torts and not criminally. This case clearly violates double jeopardy since the State used [the] same civil issue already ruled upon as [a] basis for [the] criminal conviction. The courts had already determined [that] Dr. Gillis prescribed medicine for legitimate reasons which is a lawful act for any licensed physician.[3]

"The Double Jeopardy Clause 'is a guarantee against being twice put to Trial for the same offense' and against 'being subjected to double punishments.'" *United States v. Hartley*, 612 F.2d 1009, 1010 (5th Cir. 1980)[4] (quoting *Abney v. United States*, 431 U.S. 651, 660–61 (1977)). "[T]he Double Jeopardy Clause does not prohibit the imposition of all additional sanctions that could, 'in common parlance,' be described as punishment." *Hudson v. United States*, 522 U.S. 93, 98–99 (1997) (citation omitted). "The Clause protects only against the imposition of multiple *criminal* punishments for the same offense . . . ." *Hudson*, 522 U.S. at 99 (citations omitted and italics in original).

---

[3] The Respondent submits documents from the disciplinary proceedings (Doc. 11-2 at 18–232, 3364–82) to argue that the record refutes the double jeopardy claim. (Doc. 11 at 17–18) However, because the post-conviction court did not review the documents when adjudicating the double jeopardy claim, this Court does not consider those documents on federal habeas. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").
[4] *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

"Whether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction." *Hudson*, 522 U.S. at 99. "A court must first ask whether the legislature, 'in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.'" *Hudson*, 522 U.S. at 99 (quoting *United States v. Ward*, 448 U.S. 242, 248 (1980)). "[W]here [the legislature] has indicated an intention to establish a civil penalty, [the U.S. Supreme Court has] inquired further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention." *Ward*, 448 U.S. at 248–49. "In regard to this latter inquiry, . . . 'only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground.'" *Ward*, 448 U.S. at 249 (citation omitted).

The "primary legislative purpose" of state statutes which regulate medical practice is "to ensure that every physician practicing in this state meets minimum requirements for safe practice." § 458.301, Fla. Stat. The state legislature enacted the statutes to protect the public from incompetent physicians. § 458.301, Fla. Stat. ("It is the legislative intent that physicians who fall below minimum competency or who otherwise present a danger to the public shall be prohibited from practicing in this state."). When an administrative board finds a physician guilty of misconduct, the board may punish the physician by suspending or revoking her license, restricting her practice, imposing an administrative fine of $10,000.00 for each offense, issuing a letter of reprimand, placing the physician on probation with conditions, requiring the physician to refund fees, or requiring the physician to complete remedial courses. § 456.072(2), Fla. Stat. Section 458.331(2), Florida Statutes, describes the purpose of the punishment:

> In determining what action is appropriate, the board must first consider what sanctions are necessary to protect the public or

> to compensate the patient. Only after those sanctions have been
> imposed may the disciplining authority consider and include in
> the order requirements designed to rehabilitate the physician.

Because the state legislature intended for disciplinary action against physicians to be civil in nature and the penalties are not "so punitive in form and effect as to render them criminal despite [the state legislature's] intent to the contrary," Gillis's criminal convictions and sentences do not violate double jeopardy. Even if Gillis's conduct served as the basis for both her disciplinary proceedings and her criminal charges, the post-conviction court did not unreasonably deny the double jeopardy claim. *Hudson*, 522 U.S. at 105 ("[T]he conduct for which [Office of Comptroller Currency] sanctions are imposed may also be criminal (and in this case formed the basis for petitioners' indictments). This fact is insufficient to render the money penalties and debarment sanctions criminally punitive, particularly in the double jeopardy context.") (citations omitted).

Ground Two and Ground Seven are **DENIED**.

**Ground Three**

Gillis asserts that the prosecutor misled the jury by listing predicate acts for the racketeering charge on the verdict form and that the prosecutor failed to prove the predicate acts at trial. (Doc. 2 at 13–15) She contends that the prosecutor presented unlawfully seized evidence to prove the predicate acts. (Doc. 2 at 13–15) In a supplement, she further asserts that the prosecutor misled the jury by listing the incorrect ranges of weight for the drug trafficking conspiracy charge on the verdict form. (Doc. 18)

The Respondent asserts that the claims are procedurally barred because Gillis failed to exhaust her remedies in state court. (Docs. 11 at 18–19 and 21 at 3) In her brief on direct appeal, Gillis failed to raise the claims. (Doc. 11-3 at 58–72) Because the issues raised on

direct appeal differ from the claims in Gillis's federal petition, Gillis failed to exhaust the claims. *Green v. Sec'y, Dep't Corrs.*, 28 F.4th 1089, 1135 (11th Cir. 2022) ("Presentation of a claim 'under the same general legal umbrella but with entirely different factual underpinnings [ ] does not constitute fair presentation of the . . . claim.'") (quoting *Henderson v. Campbell*, 353 F.3d 880, 898 n.25 (11th Cir. 2003)).

Gillis contends that appellate counsel deficiently performed by failing to raise the claims on direct appeal. (Doc. 1 at 9) Ineffective assistance of counsel may serve as cause to excuse a procedural default. *Murray*, 477 U.S. at 488. However, Gillis must demonstrate that she exhausted her remedies in state court for the ineffective assistance of appellate counsel claim. *Ledford*, 975 F.3d at 1161. In her petition alleging ineffective assistance of appellate counsel, Gillis asserted that appellate court deficiently performed by failing to raise the claims[5] (Doc. 11-3 at 475–76, 479–81, 530–31, 536–38), and the state appellate court dismissed the petition as successive. (Doc. 11-3 at 574) Fla. R. App. P. 9.141(d)(6)(C). Because the state appellate court dismissed the claim on an independent and adequate state law ground, appellate counsel's deficient performance does not serve as cause to excuse a procedural default. *Ledford*, 975 F.3d at 1163.

Because Gillis fails to demonstrate either cause and prejudice or manifest injustice to excuse the procedural default, the claims are procedurally barred from federal review. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37.

Ground Three is **DENIED**.

_____

[5] In the petition, Gillis failed to assert that appellate counsel deficiently performed by not arguing that the prosecutor misled the jury by listing the incorrect ranges of weight for the drug trafficking conspiracy charge on the verdict form.

**Ground Four**

Gillis asserts that the trial court violated her federal right to due process because the prosecutor failed to prove her drug trafficking conspiracy and racketeering convictions. (Doc. 1 at 10) ("Due Process Claims") She further asserts that appellate counsel was ineffective for not arguing that the prosecutor failed to prove the drug trafficking conspiracy and racketeering convictions. (Doc. 2 at 16) ("Ineffective Assistance of Appellate Counsel Claims")

### Due Process Claims

Gillis asserts that the trial court violated her federal right to due process because the prosecutor failed to prove her drug trafficking conspiracy and racketeering convictions. (Doc. 1 at 10)

### Drug Trafficking Conspiracy Conviction

The Respondent asserts that Gillis failed to exhaust the federal due process claim challenging the drug trafficking conspiracy conviction because she did not raise on direct appeal the arguments presented in her federal petition and failed to cite federal authorities. (Doc. 11 at 21–22) In her brief on direct appeal, Gillis asserted that the prosecutor failed to prove the drug trafficking conspiracy conviction and failed to prove that she acted in bad faith and not within the course of her professional practice but cited only state court opinions in support of the claims. (Doc. 11-3 at 58–61, 67–70) Because Gillis failed to alert the state appellate court to the federal nature of her claim, the claim is unexhausted. *Boerckel*, 526 U.S. at 845. Because the state court would deny the claim as procedurally defaulted if Gillis returned to state court to exhaust the claim, the claim is procedurally defaulted in federal court. Fla. R. Crim. P. 3.850(c); *Snowden*, 135 F.3d at 736.

Gillis contends that appellate counsel deficiently performed by failing to raise the federal claim on direct appeal. (Doc. 1 at 10) Ineffective assistance of counsel may serve as cause to excuse a procedural default. *Murray*, 477 U.S. at 488. However, Gillis must demonstrate that she exhausted her remedies in state court for the ineffective assistance of appellate counsel claim. *Ledford*, 975 F.3d at 1161. Gillis asserted that appellate counsel deficiently performed by failing to argue that the prosecutor did not prove the drug trafficking conspiracy conviction. (Doc. 11-3 at 155–57) The state appellate court denied the claim in a decision without a written opinion. (Doc. 11-3 at 168) Consequently, Gillis exhausted the ineffective assistance of appellate counsel claim, but she must demonstrate on federal habeas deficient performance and prejudice to excuse the procedural default. *Murray*, 477 U.S. at 488.

The third amended information charged Gillis with conspiracy to traffic twenty-eight grams or more of oxycodone or twenty-eight grams or more of a mixture containing oxycodone (Doc. 11-2 at 415):

> Statewide Prosecutor for the State of Florida, by and through the undersigned Assistant Statewide Prosecutor, under oath, charges that beginning on or about September 25, 2008, and continuing through on or about October 5, 2010, in the Sixth and Twentieth Judicial Circuits of Florida, to-wit: Pinellas and Lee Counties, Jacinta I. Gillis did knowingly and unlawfully agree, conspire, combine, or confederate with Brian Rush, Angelo Gary, Swannitha French, Milo Harris, Charles Wrotten, and with others, known or unknown, to traffic in twenty-eight grams or more of oxycodone, or any salt, derivative, isomer, or salt of an isomer thereof, a controlled substance as defined in 893.03(2)(a), or twenty-eight grams or more of any mixture containing any such substance, but less than thirty kilograms, in violation of Sections 893.135(5) and 893.135(1)(c)(1)(c), Florida Statues.

Section 893.135(1)(c)(1)(c), Florida Statutes (2010), criminalizes knowingly delivering oxycodone:

> Except as authorized in this chapter or in chapter 499 and notwithstanding the provisions of section 893.13: Any person who knowingly sells, purchases, manufactures, delivers, or brings into this state, or who is knowingly in actual or constructive possession of, four grams or more of any morphine, opium, oxycodone, hydrocodone, hydromorphone, or any salt, derivative, isomer, or salt of an isomer thereof, including heroin, as described in Section 893.03(1)(b), (2)(a), (3)(c)(3), or (3)(c)(4), or four grams or more of any mixture containing any such substance, but less than thirty kilograms of such substance or mixture, commits a felony of the first degree, which felony shall be known as "trafficking in illegal drugs," punishable as provided in Section 775.082, Section 775.083, or Section 775.084.
>
> If the quantity involved[ ] [i]s twenty-eight grams or more, but less than thirty kilograms, such person shall be sentenced to a mandatory minimum term of imprisonment of twenty-five calendar years and pay a fine of $500,000.

Section 893.05(1), Florida Statutes (2010), authorizes a physician to prescribe a controlled substance "in good faith and in the course of his or her professional practice only":

> A practitioner, in good faith and in the course of his or her professional practice only, may prescribe, administer, dispense, mix, or otherwise prepare a controlled substance, or the practitioner may cause the same to be administered by a licensed nurse or an intern practitioner under his or her direction and supervision only.

*Deonarine v. State*, 967 So. 2d 333, 337 (Fla. 4th DCA 2007), explains that a physician violates Florida's criminal drug laws by prescribing a controlled substance in bad faith and not in the course of professional practice:

> In *State v. Vinson*, 298 So. 2d 505, 507 (Fla. 2d DCA 1974), the Second District Court of Appeal recognized that in enacting its drug laws, "the Legislature intended to encompass a situation

> where a doctor, by reason of his right to issue prescriptions, does so in bad faith and thereby provides a user with the vehicle with which to obtain the drug he could not otherwise acquire." It is the act of prescribing the controlled substance in bad faith that subjects the physician to criminal prosecution. *Id.* This is so regardless of whether the prescription is filled. Thus, "[t]he physician who has issued a prescription for a drug in bad faith and not in the course of his professional practice has done everything he can do toward committing the crime." *Id.* at 509.

*See also Rodenberg v. State*, 198 So. 3d 930, 934 (Fla. 4th DCA 2016) ("Section 893.05(1) requires that a practitioner act both in good faith and in the course of his professional practice for the exception to apply.").

Under Florida law, "[g]enerally, 'good faith' and 'in the course of professional practice' are affirmative defenses, not elements of the offenses, because section 893.05(1) is separate from the delivery and trafficking statutes." *Rodenberg*, 198 So. 3d at 934. "The defendant has the burden of going forward to show that the affirmative defense exists and the burden then shifts to the state to prove the nonexistence of the defense beyond a reasonable doubt." *Royal v. State*, 784 So. 2d 1210, 1211 (Fla. 5th DCA 2001).

"[T]he definition of 'good faith', in the context of [Section 893.05(1)], [ ] mean[s] that the practitioner 'has got to act in an honest endeavor to carry on his profession' of healing patients." *State v. Weeks*, 335 So. 2d 274, 277 (Fla. 1976) (citing *Needelman v. United States*, 261 F.2d 802, 805 (5th Cir. 1958)).

Recently, *Ruan v. United States*, 597 U.S. 450, 457 (2022), construed the federal criminal drug statutes and held that the federal statute that prohibits unlawful dispensing of a controlled substance requires a prosecutor to prove that the physician knowingly or intentionally acted in an unauthorized manner:

> As we have said, Section 841 makes it unlawful, "[e]xcept as authorized[,] . . . for any person knowingly or intentionally . . .

> to manufacture, distribute, or dispense . . . a controlled
> substance." We now hold that Section 841's "knowingly or
> intentionally" *mens rea* applies to the "except as authorized"
> clause. This means that once a defendant meets the burden of
> producing evidence that his or her conduct was "authorized,"
> the Government must prove beyond a reasonable doubt that the
> defendant knowingly or intentionally acted in an unauthorized
> manner.

Before the U.S. Supreme Court's opinion issued, the Eleventh Circuit had held that "a doctor's 'subjectiv[e] belie[f] that he is meeting a patient's medical needs by prescribing a controlled substance' is not a 'complete defense' to a [ ] prosecution," and instead "'[w]hether a defendant acts in the usual course of his professional practice must be evaluated based on an *objective* standard, not a subjective standard.'" *Ruan*, 597 U.S. at 456 (italics in original and citation omitted). The Tenth Circuit had held "the Government must prove that a doctor 'either: (1) subjectively knew a prescription was issued not for a legitimate medical purpose; or (2) issued a prescription that was objectively not in the usual course of professional practice.'" *Ruan*, 597 U.S. at 457 (citation omitted).

*Ruan*, 597 U.S. at 467, rejected both the Eleventh Circuit's and the Tenth Circuit's holdings and held that the prosecutor must prove that the physician knowingly and intentionally acted in an unauthorized manner. *Ruan*, 597 U.S. at 457. However, *Ruan*, 597 U.S. at 467, clarified that the prosecutor may prove the physician's intent with circumstantial evidence and an evaluation of objective criteria:

> The Government, of course, can prove knowledge of a lack of
> authorization through circumstantial evidence. *See ibid.* And
> the regulation defining the scope of a doctor's prescribing
> authority does so by reference to objective criteria such as
> "legitimate medical purpose" and "usual course" of
> "professional practice." 21 C.F.R. § 1306.04(a); *see Gonzales*,
> 546 U.S. at 285 (Scalia, J., dissenting) ("The use of the word
> 'legitimate' connotes an objective standard of 'medicine'");
> *Moore*, 423 U.S. at 141–142 (describing Congress' intent "to

confine authorized medical practice within accepted limits" (emphasis added)). As we have said before, "the more unreasonable" a defendant's "asserted beliefs or misunderstandings are," especially as measured against objective criteria, "the more likely the jury . . . will find that the Government has carried its burden of proving knowledge." *Cheek v. United States*, 498 U.S. 192, 203–204 (1991). But the Government must still carry this burden. And for purposes of a criminal conviction under Section 841, this requires proving that a defendant knew or intended that his or her conduct was unauthorized.

Because opinions by Florida courts analyzing Florida statutes relied on federal cases to determine the burden of proof under Florida law, this Court directed the parties to submit supplemental briefing addressing how *Ruan* impacts Gillis's federal due process claims in Ground Four. (Doc. 41) *See Rodenberg*, 198 So. 3d at 934 (citing *United States v. Nelson*, 383 F.3d 1227 (10th Cir. 2004)). *Weeks*, 335 So. 2d at 277 (citing *United States v. Moore*, 423 U.S. 122 (1975)).

Gillis contends that *Ruan* applies and asserts that the prosecutor failed to prove that Gillis acted in an unauthorized manner. (Doc. 54 at 13–17) The Respondent argues that *Ruan* does not retroactively apply to Gillis's case and does not apply to Gillis's sufficiency of the evidence claims based on state law. (Doc. 66)

Assuming that *Ruan* retroactively applies to Gillis's claims on federal habeas, *Ruan* does not apply to Gillis's sufficiency of the evidence claims based on state law. The Florida statute authorizing a physician to prescribe a controlled substance critically differs from the federal regulation that authorizes a prescription. Section 893.05(1), Florida Statutes (2010) (bolding added), states that: "A practitioner, **in good faith and in the course of his or her professional practice only**, may prescribe, administer, dispense, mix, or otherwise prepare a controlled substance . . . ." Section 1306.04(1), 21 C.F.R., does not contain the same

"good faith" language: "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."

*Ruan*, 597 U.S. at 465 (italics in original), relied on the absence of "good faith" language in the federal statutes and regulations to reject the United States' argument that a "good faith" standard applies:

> Resisting the "knowingly or intentionally" standard, the Government instead offers a substitute *mens rea* standard. The Government says that rather than simply apply the statute's "knowingly or intentionally" language to the authorization clause, we should read the statute as implicitly containing an "objectively reasonable good-faith effort" or "objective honest-effort standard." Brief for United States 16–17; *cf. post*, at 2389 (concurrence arguing that doctors can defend against a Section 841 prosecution by proving that they have "act[ed] in subjective good faith in prescribing drugs"). That is to say, once a defendant meets his or her burden of production, the Government can convict "by proving beyond a reasonable doubt that [the defendant] did not even make an objectively reasonable attempt to ascertain and act within the bounds of professional medicine." Brief for United States 16.

> We are not convinced. For one thing, Section 841, like many criminal statutes, uses the familiar *mens rea* words "knowingly or intentionally." It nowhere uses words such as "good faith," "objectively," "reasonable," or "honest effort."

> For another, the Government's standard would turn a defendant's criminal liability on the mental state of a hypothetical "reasonable" doctor, not on the mental state of the defendant himself or herself. *Cf. id.*, at 24 (Government arguing that "a physician can violate Section 841(a) when he makes no objectively reasonable attempt to conform his conduct to something *that his fellow doctors would view as medical care*" (emphasis added)).

*Ruan*, 597 U.S. at 454, addressed what the appropriate scienter requirement is for a physician, who is charged with violating federal drug statutes and who claims that she

33

prescribed the controlled substance "for a legitimate medical purpose . . . acting in the usual course of [her] professional practice." 21 C.F.R. § 1306.04(a). Because the plain language of Section 893.05(1) (2010), states that a physician may prescribe a controlled substance "in good faith and in the course of his or her professional practice only," a good faith standard applies to a prosecution under Florida law. Because the Florida legislature defined the scienter requirement for the affirmative defense, the ambiguity in the federal law that *Ruan* resolved does not exist in Florida law.

Also, the affirmative "good faith" defense under Section 893.05(1) (2010), operates in the manner that *Ruan* requires the federal "knowingly or intentionally" standard to operate. Under Florida law, the defendant carries the burden of production for an affirmative defense, and the prosecutor carries the burden of persuasion and must demonstrate beyond a reasonable doubt that the evidence rebuts the affirmative defense. *Royal*, 784 So. 2d at 1211.[6] Under federal law, "[i]t shall not be necessary for the United States to negative any exemption or exception set forth in this subchapter . . ., and the burden of going forward with the evidence with respect to any such exemption or exception shall be upon the person claiming its benefit." 21 U.S.C. § 885(a)(1). Relying on Section 885(a)(1), *Ruan*, 597 U.S. at 468, held that "in a [federal drug] prosecution in which a defendant meets his burden of production under Section 885, the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an

---

[6] *See also* § 893.10(1), Fla. Stat. (2010) ("It is not necessary for the state to negative any exemption or exception set forth in this chapter in any indictment, information, or other pleading or in any trial, hearing, or other proceeding under this chapter, and the burden of going forward with the evidence with respect to any exemption or exception is upon the person claiming its benefit.").

unauthorized manner." Consequently, the "good faith" standard under Florida law does not conflict with *Ruan*.

To overcome the procedural default, Gillis must demonstrate that appellate counsel deficiently performed by not asserting on direct appeal that the prosecutor failed to prove that she acted in bad faith and not in the course of professional practice. Gillis preserved the claim for review on direct appeal by moving for a judgment of acquittal at trial. (Doc. 11-2 at 2975–79) "'[I]n passing on a motion for judgment of acquittal where a defendant has asserted an affirmative defense, the proper test is to determine, first, whether the defendant produced competent evidence of an affirmative defense and, second, whether the state has carried its burden of contradicting that evidence to the extent that a jury issue is made.'" *McCoy v. State*, 56 So. 3d 37, 39–40 (Fla. 1st DCA 2010) (quoting *B.D.K. v. State*, 743 So. 2d 1155, 1157 (Fla. 2d DCA 1999)).

"[A] defendant seeking judgment of acquittal admits not only the facts in evidence, but also every reasonable inference favorable to the State that can be drawn from the evidence." *Krupkin v. State*, 119 So. 3d 1267, 1270 (Fla. 1st DCA 2013). "[Q]uestions of intent are especially suited for jury determinations because intent is rarely proved with direct evidence and 'reasonable men may differ in determining intent when taking into consideration the surrounding circumstances.'" *Moore v. State*, 295 So. 3d 1259, 1265 (Fla. 2d DCA 2020) (quoting *State v. Tovar*, 110 So. 3d 33, 36 (Fla. 2d DCA 2013)).

The evidence at trial proved that Gillis opened two pain management clinics, hired a friend to manage the clinics, hired a driver to drive Gillis between the two clinics, count cash at the clinics, and pay other employees at the clinics, hired a scheduler to answer telephone calls and schedule appointments, and hired a security guard who wrote the names

35

of patients on prescriptions and scheduled follow-up appointments. (Doc. 11-2 at 1470–71, 1553–62, 1582–83, 1601–09) The manager expressed concern to Gillis about some patients receiving pain medication, and Gillis responded, "I am the doctor." (Doc. 11-2 at 1514) The security guard told Gillis that patients in the waiting room appeared intoxicated, and Gillis responded, "Let me be the judge of that, I'm the doctor." (Doc. 11-2 at 1598–99) Gillis's employees gave prescriptions to patients, even when Gillis was not at the clinic. (Doc. 11-2 at 1606–09)

The evidence further proved that Gillis prescribed patients large quantities of oxycodone without examining the allegedly painful areas on the patient's body, without requiring a drug test to screen for drug abuse, without explaining the dangers of consuming large quantities of the powerful painkiller, and sometimes without meeting with the patient. Gillis admitted to a detective that she met with forty or fifty patients a day and instructed her employees to write a patient's name on a prescription already filled out and signed by Gillis. (Doc. 11-2 at 2480, 2485–88) When an undercover detective told Gillis that he ran out of his prescribed medication because his girlfriend, who broke her tooth, took some to manage her pain, Gillis warned the detective that he had violated the clinic's rules but prescribed him more oxycodone. (Doc. 11-2 at 1192–93, 1198) When another undercover detective told Gillis that he illegally abused "Roxicodone," Gillis prescribed him oxycodone. (Doc. 11-2 at 1333–38, 1337) When Gillis prescribed a third undercover detective methadone, the detective asked for oxycodone, Gillis responded, "This isn't a supermarket," but still prescribed the detective oxycodone. (Doc. 11-2 at 1407–08)

Gillis prescribed oxycodone to patients who had unlawfully obtained pain pills before seeking treatment. (Doc. 11-2 at 1645, 1665, 1732, 1890, 1915) She prescribed

oxycodone to a patient who had track marks on his body from prior illegal intravenous drug use. (Doc. 11-2 at 2120, 2126–28) Other patients described how they became addicted to oxycodone under Gillis's care and suffered severe withdrawals when her clinics closed. (Doc. 11-2 at 1651–52, 1672–75, 1725–26, 1740–41, 1759–60, 1787, 1808, 1876, 1901)

Gillis prescribed the first undercover detective 150 thirty-milligram pills of oxycodone for a thirty-day period (Doc. 11-2 at 1121) and the second detective 210 fifteen-milligram pills of oxycodone for a thirty-day period. (Doc. 11-2 at 1337) A pharmacist testified that consuming eighty milligrams of oxycodone in one day is lethal for a person who does not regularly take oxycodone. (Doc. 11-2 at 2759–60) Gillis also prescribed the first detective oxycodone, methadone, and Valium. (Doc. 11-2 at 1121) The anesthesiologist described this combination of drugs as dangerous. (Doc. 11-2 at 2819–20)

The undercover detectives obtained from a pharmacy some of the oxycodone prescribed by Gillis. (Doc. 11-2 at 1124–27, 1135–38, 1150–53, 1161–70) A chemist testified that the oxycodone pills weighed 75.8 grams. (Doc. 11-2 at 2068–78) Viewing this evidence in the light most favorable to the prosecution, the prosecutor sufficiently rebutted Gillis's claim that she acted "in good faith and in the course of [ ] her professional practice." § 893.05(1), Fla. Stat. (2010). *Wright v. State*, 174 So. 3d 558, 563 (Fla. 4th DCA 2015) ("'[T]he issue of an affirmative defense should not be resolved by a judgment of acquittal and should be submitted to the jury where the facts are disputed.'") (quoting *Turner v. State*, 29 So. 3d 361, 364 (Fla. 4th DCA 2010)).

Also, even if *Ruan* applied to Gillis's claim, the prosecutor sufficiently rebutted the evidence that Gillis prescribed the oxycodone for a legitimate medical purpose and acted in the usual course of her professional practice. *Ruan*, 597 U.S. at 467. The evidence, viewed

in the light most favorable to the prosecution, demonstrated that Gillis knowingly and intentionally acted in an unauthorized manner. *Ruan*, 597 U.S. at 467.

Because a sufficiency of the evidence claim for the drug trafficking conspiracy conviction would not succeed on direct appeal, appellate counsel did not deficiently perform by failing to raise the claim. Consequently, ineffective assistance of appellate counsel does not serve as cause to excuse the procedural default, and the federal due process claim is procedurally barred on federal review. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief."). Even if the federal due process claim challenging the drug trafficking conspiracy conviction is exhausted, the post-conviction court did not unreasonably deny the claim for the same reasons above.

### Racketeering Conviction

The Respondent asserts that Gillis failed to exhaust the federal due process claim challenging the racketeering conviction because she did not raise the claim on direct appeal. (Doc. 11 at 21) In her brief on direct appeal, Gillis asserted that the prosecutor failed to prove that she acted in bad faith and not within the course of her professional practice. (Doc. 11-3 at 67–70) However, Gillis cited only state court opinions to support her claim. (Doc. 11-3 at 67–70) Because Gillis failed to alert the state appellate court to the federal nature of her claim, the claim is unexhausted. *Boerckel*, 526 U.S. at 845. Because the state court would deny the claim as procedurally defaulted if Gillis returned to state court to exhaust the claim, the claim is procedurally defaulted in federal court. Fla. R. Crim. P. 3.850(c); *Snowden*, 135 F.3d at 736.

Gillis contends that appellate counsel deficiently performed by failing to raise the claim on direct appeal. (Doc. 1 at 10) Ineffective assistance of counsel may serve as cause to excuse a procedural default. *Murray*, 477 U.S. at 488. However, Gillis must demonstrate that she exhausted her remedies in state court for the ineffective assistance of appellate counsel claim. *Ledford*, 975 F.3d at 1161. Gillis asserted that appellate counsel deficiently performed by failing to argue that the prosecutor did not prove the racketeering conviction. (Doc. 11-3 at 157–58) The state appellate court denied the claim in a decision without a written opinion. (Doc. 11-3 at 168) Consequently, Gillis exhausted the ineffective assistance of appellate counsel claim, and she must demonstrate on federal habeas deficient performance and prejudice to excuse the procedural default. *Murray*, 477 U.S. at 488.

The third amended information charged Gillis with engaging in a pattern of racketeering activity between September 25, 2008, and January 30, 2011. (Doc. 11-2 at 340) The information identified 102 predicate acts for prescribing oxycodone and methadone to thirty-three patients. (Doc. 11-2 at 340–76)

"The elements of a crime under Florida's RICO statute are (1) conduct or participation in an enterprise through (2) a pattern of racketeering activity." *Lugo v. State*, 845 So. 2d 74, 97 (Fla. 2003). "With regard to the 'enterprise' element, the [prosecutor] must prove the following sub-elements: (1) an ongoing organization, formal or informal, with a common purpose of engaging in a course of conduct, which (2) functions as a continuing unit." *Lugo*, 845 So. 2d at 97. A "'[p]attern of racketeering activity' means engaging in at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents." § 895.02(7),

Fla. Stat. "'Racketeering activity' means to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit: Any crime that is chargeable by petition, indictment, or information under the following provisions of the Florida Statutes: Chapter 893, relating to drug abuse prevention and control." § 895.02(8)(a)(48), Fla. Stat.

The evidence at trial proved that Gillis opened two pain management clinics and charged $125.00 in cash for prescriptions for large quantities of oxycodone and methadone. (Doc. 11-2 at 1470–71, 1553–62, 1582–83, 1601–09) Linda Simmons testified that she suffered pain from three collapsed discs in her neck, had never taken any pain medication like oxycodone or methadone, received a prescription for oxycodone and methadone from Gillis during her first visit, returned to the clinic sixteen times, never took a urine test to screen for drug abuse, never received advice on alternative treatment, and once received a prescription without meeting with Gillis. (Doc. 11-2 at 1805–13)

Kimberly Sweigart testified that she suffered pain in her back and hip, had unlawfully taken Vicodin and Percocet before seeking treatment from Gillis, received a prescription for oxycodone from Gillis during her first visit, paid $125.00 in cash, returned to the clinic between February 19, 2009, and September 17, 2010, never took a urine test to screen for drug abuse, and twice received a prescription without meeting with Gillis. (Doc. 11-2 at 1914–20) Patient records admitted into evidence proved that Gillis prescribed large quantities of oxycodone and methadone to Simmons, Sweigart, and the other patients identified in the list of predicate acts for the racketeering charge in the information. (Docs. 11-2 at 2330–33 and 37-2 at 2–66)

An anesthesiologist, board certified in pain management, testified that a doctor who prescribes pain medication should administer a drug test to screen for drug abuse, should first prescribe the lowest possible dose for two weeks, and should always meet with a patient in the office before prescribing any pain medication. (Doc. 11-2 at 2786–93, 2806, 2827) The doctor opined that, for all 167 patients identified in medical records seized from Dollar Medical, except a patient who suffered from lung cancer, Gillis prescribed medication outside the course of ordinary professional practice and contrary to "an honest endeavor to carry on a profession of healing patients." (Doc. 11-2 at 2895–96)

This evidence, viewed in the light most favorable to the prosecution, sufficiently rebutted a claim that Gillis acted "in good faith and in the course of [ ] her professional practice." § 893.05(1), Fla. Stat. (2010). Even if *Ruan* applied to Gillis's claim, the prosecutor sufficiently rebutted the evidence that Gillis prescribed the oxycodone for a legitimate medical purpose and acted in the usual course of her professional practice. *Ruan*, 597 U.S. at 467. Consequently, the issue on appeal would not succeed, ineffective assistance of appellate counsel does not serve as cause to excuse the procedural default, and the federal due process claim is procedurally barred on federal habeas. *Pinkney*, 876 F.3d at 1297. Even if the federal due process claim challenging the racketeering conviction is exhausted, the post-conviction court did not unreasonably deny the claim for the same reasons above.

**Ineffective Assistance of Appellate Counsel Claim**

Gillis asserts that appellate counsel was ineffective for arguing that the prosecutor failed to prove drug trafficking because Gillis was convicted of conspiracy to engage in drug trafficking. (Doc. 2 at 16) Gillis raised this claim in her petition alleging ineffective assistance of appellate counsel. (Doc. 11-3 at 156) The state appellate court denied the claim

in a decision without a written opinion. (Doc. 11-3 at 168) Gillis must demonstrate no

reasonable basis for relief. *Richter*, 562 U.S. at 98.

In the brief on direct appeal, appellate counsel argued that the prosecutor failed to

prove the drug trafficking conspiracy conviction in the heading of the relevant section of the

brief (Doc. 11-3 at 58):

> There was insufficient evidence to support the conspiracy to
> traffic conviction in Count Five because the prosecutor
> impermissibly added multiple prescriptions to reach the
> requisite weight.

In the body of the brief, appellate counsel referred to the conspiracy conviction as the

"trafficking conviction." (Doc. 11-3 at 60) The jury convicted Gillis of only one drug

conviction — the drug trafficking conspiracy conviction in Count Five. (Doc. 11-2 at 3260)

Despite his short-hand reference to the drug trafficking conspiracy conviction as the

"trafficking conviction" in the body of the brief, appellate counsel challenged the drug

trafficking conspiracy conviction. Also, appellate counsel separately argued that the

prosecutor failed to prove all convictions by not presenting evidence that she acted in bad

faith or not within the course of her professional practice. (Doc. 11-3 at 67–70) Because

appellate counsel argued on direct appeal that the prosecutor failed to prove the drug

trafficking conspiracy conviction, the record refutes Gillis's claim, and the state appellate

court did not unreasonably deny the claim.

Gillis asserts that appellate counsel's deficient performance prejudiced her because

(1) the prosecutor failed to prove that she acted in bad faith and not within the course of

professional practice, (2) the prosecutor relied on documents unlawfully seized in violation

of the Fourth Amendment to prove the crime, (3) the prosecutor failed to prove that she

conspired with another person to commit an illegal act, (4) the prosecutor failed to present

testimony by an expert who reviewed all the records and could opine that Gillis did not act in good faith and within the course of professional practice, and (5) the prosecutor failed to present reliable evidence of the weight of illegal controlled substances.  (Doc. 2 at 16–19)

To demonstrate prejudice under *Strickland*, 466 U.S. at 694, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Because the record refutes Gillis's allegation that appellate counsel deficiently performed, her claim fails. *Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

Also, as explained above in the ruling on Gillis's federal due process claims, the evidence, viewed in the light most favorable to the prosecution, proved that Gillis did not act in good faith or within the course of her professional practice, that she conspired with her employees to unlawfully prescribe at least twenty-eight grams of oxycodone, and that she unlawfully prescribed oxycodone to the patients identified in the list of charged predicate acts for the racketeering conviction. Also, as explained in the ruling on Ground One of the federal petition, Gillis's Fourth Amendment claim is procedurally barred on federal habeas. If Gillis intends to raise these claims as separate claims, the claims fail for the same reasons.

Ground Four is **DENIED**.

**Ground Five**

Gillis asserts that the trial court violated her Sixth Amendment right to counsel by dismissing her attorney on the morning of trial, appointing a new attorney who did not

practice criminal law and who lacked knowledge about Gillis's case, and forcing Gillis to proceed *pro se* with the new attorney as standby counsel. (Doc. 2 at 20–22)

The Respondent asserts that the claim is procedurally barred because Gillis failed to exhaust her remedies in state court. (Doc. 11 at 26–27) In her brief on direct appeal, Gillis failed to raise the Sixth Amendment claim. (Doc. 11-3 at 58–72) Gillis raised the claim in her motion for post-conviction relief (Doc. 11-3 at 191–94), and the post-conviction court denied the claim as procedurally barred (Doc. 11-3 at 360) (state court record citations omitted):

> . . . Defendant alleges that she was denied effective assistance of counsel because the Court dismissed her standby counsel on the morning of trial.[3] When a defendant proceeds *pro se*, he or she has no right to standby counsel or hybrid representation. *Paul v. State*, 152 So. 3d 635 (Fla. 4th DCA 2014). Claims that a trial court denied a defendant the counsel of her choice or that she received ineffective assistance of counsel by proceeding *pro se* are not cognizable in a proceeding pursuant to Rule 3.850. *Bundy v. State*, 497 So. 2d 1209, 1210 (Fla. 1986); *see also Johnson v. State*, 593 So. 2d 206, 208 (Fla. 1992) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack."). Therefore, this claim is denied.[4]

> [3] Although her claim specifically alleges that she was denied "effective assistance of counsel," it is not a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 694 (1984); it is a claim of trial court error. She alleges that the trial court denied her effective assistance of counsel by discharging her standby counsel, Mr. Potts.

> [4] To the extent that Defendant claims she involuntarily proceeded *pro se*, the record refutes that claim. On October 5, 2015, the Court held a hearing wherein Defendant asked to proceed *pro se* and after a lengthy colloquy, the Court granted that request. The Court confirmed with Defendant that she wished to proceed *pro se* the

> day prior to trial, and at the end of the hearing discharged Mr. Potts. The Court confirmed again immediately prior to trial that she wished to proceed *pro se*.

Because the post-conviction court denied the claim on an independent and adequate state law ground, the claim is procedurally barred. *LeCroy*, 421 F.3d at 1260 n.25.

In her reply, Gillis contends that she exhausted her remedies in *Gillis v. State*, No. 2D20-2321 (Fla. 2d DCA). (Doc. 12 at 9) Gillis raised the claim in a petition for a writ of habeas corpus filed in the state supreme court. (Doc. 11-3 at 598–600) The state supreme court transferred the petition to the state appellate court (Doc. 11-3 at 646), and the state appellate court denied the petition in a decision without a written opinion. (Doc. 11-3 at 713) "Habeas corpus is not a second appeal and cannot be used to litigate or relitigate issues which could have been, should have been, or were raised on direct appeal." *Breedlove v. Singletary*, 595 So. 2d 8, 10 (Fla. 1992). A federal court may not presume that "had the state court issued an opinion, it would have ignored its own procedural rules and reached the merits of [the claim]." *Tower v. Phillips*, 7 F.3d 206, 211 (11th Cir. 1993). Consequently, the claim is procedurally barred on federal habeas. *Kight v. Singletary*, 50 F.3d 1539, 1545 (11th Cir. 1995) ("Where, as here, a clearly meritorious claim is procedurally barred and the state court denies relief without opinion, 'the most reasonable assumption is that . . . the state court . . . enforced the procedural bar.'") (citation omitted).

Ground Five is **DENIED**.

## Ground Six

Gillis asserts that the trial court violated her federal right to due process because the prosecutor failed to prove the two money laundering convictions. (Doc. 2 at 23–25) She

contends that the evidence did not prove that she attempted to hide the money or that the money derived from illegal activity. (Doc. 2 at 23–25)

The Respondent asserts that the claim is procedurally barred because Gillis failed to present the claim during trial. (Doc. 11 at 31) Gillis, who represented herself at trial, moved for judgment of acquittal, argued that "[t]here was no intent and no bad act," and asserted that the prosecutor failed to prove an illegal act. (Doc. 11-2 at 2972, 2975–79) She further argued that she lawfully deposited the cash into the bank as follows (Doc. 11-2 at 2976):

> [Gillis:]          The banks testified that Dr. Gillis followed all laws related to the deposit of her money that was legally and lawfully earned for services provided to her patients for medical problems.

Gillis raised the claim in her brief on direct appeal and cited federal authorities. (Doc. 11-3 at 61–66) In an answer brief, the State of Florida argued that Gillis failed to preserve the issue for review on appeal and alternatively argued that the issue was meritless. (Doc. 11-3 at 95–107) The state appellate court affirmed in a decision without a written opinion. *Gillis*, 275 So. 3d at 576.

Because Gillis adequately preserved the issue for review on appeal, this Court will not presume that the state appellate court denied the claim as procedurally barred. *Siebert v. Allen*, 455 F.3d 1269, 1271 (11th Cir. 2006) ("When a state court correctly applies a procedural default principle of state law, federal courts must abide by the state court decision, but only if the state procedural rule is regularly followed.") (citations omitted). Gillis must demonstrate no reasonable basis for the state appellate court's denial of relief. *Richter*, 562 U.S. at 98.

The information charged Gillis with engaging in money laundering between January

1, 2009, and December 31, 2009 (Count Three) and between January 1, 2010, and October

5, 2010 (Count Four) in violation of Section 896.101(3)(a), Florida Statutes. (Doc. 11-2 at

414) Section 896.101(3)(a) (bolding added), criminalizes money laundering as follows:

> (3) It is unlawful for a person:
>
>> (a) Knowing that the property involved in a financial
>> transaction represents the proceeds of some form of
>> unlawful activity, to conduct or attempt to conduct such
>> a financial transaction which in fact involves the
>> proceeds of specified unlawful activity:
>>
>>> 1. With the intent to promote the carrying on of
>>> specified unlawful activity; **or**
>>>
>>> 2. Knowing that the transaction is designed in
>>> whole or in part:
>>>
>>>> a. To conceal or disguise the nature, the
>>>> location, the source, the ownership, or the
>>>> control of the proceeds of specified
>>>> unlawful activity; **or**
>>>>
>>>> b. To avoid a transaction reporting
>>>> requirement or money transmitters'
>>>> registration requirement under state law.

Gillis contends that the prosecutor failed to prove that the money derived from illegal

activity. (Doc. 2 at 23–25) As explained in the ruling on the federal due process claims in

Ground Five, the evidence viewed in the light most favorable to the prosecution proved that

Gillis conspired with her employees to unlawfully prescribe large quantities of oxycodone

for cash. She deposited that cash into bank accounts, kept cash in a safety deposit box, and

used cash to pay employees' salaries and rent for her clinics. This evidence viewed in the

light most favorable to the prosecution proved that Gillis conducted financial transactions

that "involve[d] the proceeds of a specified unlawful activity." §§ 896.101(2)(h), Fla. Stat.

("'Specified unlawful activity' means any 'racketeering activity' as defined in § 895.02."); 895.02(8)(a)(48), Fla. Stat. ("'Racketeering activity' means to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit: Any crime that is chargeable by petition, indictment, or information under the following provisions of the Florida Statutes: Chapter 893, relating to drug abuse prevention and control.").

Gillis further contends that the prosecutor failed to prove that she attempted to hide the money. (Doc. 2 at 23–25) The money laundering statute requires proof that the defendant conducted a financial transaction which involves the proceeds of unlawful activity either "with the intent to promote the carrying on of specified unlawful activity" (promotional money laundering), **or** "'knowing that the transaction is designed . . . [t]o conceal or disguise the nature, the location, the source, the ownership, or the control' of the proceeds" (concealment money laundering), **or** "knowing that the transaction is designed . . . [t]o avoid a transaction reporting requirement" (structuring money laundering). § 896.101(3)(a), Fla. Stat. The third amended information charged Gillis with money laundering under the theories of promotional money laundering, concealment money laundering, and structuring money laundering. (Doc. 11-2 at 414) *See United States v. Iriele*, 977 F.3d 1155, 1173–74 (11th Cir. 2020). The statute's use of the disjunctive word "or" requires the prosecutor to prove only one of the three theories of prosecution described in the statute.

### Promotional Money Laundering

Gillis told the detective that she paid Milo Harris and Greg Newton, both office managers at Dollar Medical, $900.00 a week each, and paid herself $80,000.00 a year. (Doc.

11-2 at 2455, 2464) Swannitha French, a medical assistant at Dollar Medical, testified that she received $1,000.00 a week. (Doc. 11-2 at 1473) Charles Wrotten, a driver and office manager at Dollar Medical, testified that he received $1,200.00 a week. (Doc. 11-2 at 1556) Angelo Gary, a security guard at Dollar Medical, testified that he received $900.00 a week, and his wife, Schoene Gary, a scheduler at Dollar Medical, testified that she received $1,000.00 a week. (Doc. 11-2 at 1585, 1612) Wrotten testified that he collected cash from patients and used that cash to pay the employees at the clinics. (Doc. 11-2 at 1560) Gillis told the detective that either Newton or Harris paid $2,600.00 a month for rent in one location. (Doc. 11-2 at 2464) These payments for salaries and rent with cash earned from unlawful activity, viewed in the light most favorable to the prosecution, supported Gillis's conviction for money laundering based on a theory of promotional money laundering. *See United States v. Azmat*, 805 F.3d 1018, 1038 (11th Cir. 2015) (holding that the government proved promotional money laundering by presenting evidence that the defendant-doctor "knew that the patients' money — which they paid for illegal prescriptions — was used to pay his salary and the salaries of those around him, in addition to supplying the clinic and paying the lease").[7]

**Structuring Money Laundering**

A bank teller testified that, on June 2, 2009, Gillis deposited sixteen separate bundles of cash ranging from $2875.00 to $10,000.00. (Doc. 11-2 at 2152–54) Under those circumstances, the bank's computer system did not automatically generate a large currency

---

[7] Unlike the federal money laundering statute, the state statute does not require proof of interstate commerce. *See* § 896.101(2)(c), Fla. Stat. (defining "financial transaction" in part as "a transaction . . . involving one or more monetary instruments, which in any way or degree affects commerce").

transaction report to alert the federal government to potential money laundering activity. (Doc. 11-2 at 2312–13) Data on one of the computers belonging to Gillis seized by law enforcement showed a search on Google for the following: "How much money can you deposit in the bank without the IRS getting suspicious," and "What is the max amount you can deposit without IRS finding out." (Doc. 11-2 at 2719–20) These sixteen deposits, which were $10,000.00 or less, viewed in the light most favorable to the prosecution, supported Gillis's conviction for money laundering based on a theory of structuring money laundering. § 896.101(3)(a)(2)(b), Fla. Stat. ("Knowing that the transaction is designed in whole or in part: To avoid a transaction reporting requirement . . . ."). *See Iriele*, 977 F.3d at 1174 ("[S]tructuring money laundering is the use of illegally obtained funds to carry out a financial transaction that is designed to avoid a state or federal reporting requirement.").

**Concealment Money Laundering**

A bank teller testified that Gillis regularly visited the bank, always first accessed her safety deposit box, and returned to the teller's counter to deposit a large amount of cash. (Doc. 11-2 at 2309–11) Gillis accessed the safety deposit box alone in a private room. (Doc. 11-2 at 2143–44) The bank employees did not know the contents of Gillis's safety deposit box. (Doc. 11-2 at 2142) When Gillis attempted to obtain a mortgage to purchase a home, Gillis told a mortgage loan officer that she kept between $125,000.00 and $250,000.00 in cash from her business in the safety deposit box. (Doc. 11-2 at 2201–03) When the mortgage loan officer asked Gillis to demonstrate that the source of the cash was legitimate, Gillis failed to do so. (Doc. 11-2 at 2204–05) This evidence that proved that Gillis placed cash earned from unlawful activity in a safety deposit box, viewed in the light most favorable to the prosecution, supported Gillis's conviction for money laundering based on a theory of

concealment money laundering. § 896.101(2)(i), Fla. Stat. (defining "transaction . . . with respect to a financial institution" to include "use of a safety deposit box"). *See United States v. Gonzales*, 918 F.3d 808, 815–16 (10th Cir. 2019) (holding that the defendant committed concealment money laundering by placing proceeds of drug sales in a safety deposit box on a particular date with the intent to "conceal the nature, source, ownership, and control of the drug proceeds").

Because the evidence at trial, viewed in the light most favorable to the prosecution, supported Gillis's conviction for money laundering under the theories of promotional money laundering, structuring money laundering, and concealment money laundering, and the state money laundering statute required proof of only one of the three theories of prosecution, the state appellate court did not unreasonably deny the federal due process claim. *Richter*, 562 U.S. at 98.

Ground Six is **DENIED**.

Accordingly, it is **ORDERED** that Gillis's petition (Doc. 1) is **DENIED**. The Clerk is **DIRECTED** to enter a judgment against Gillis and **CLOSE** this case.

## DENIAL OF CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Gillis neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that she seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on August 15, 2025.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE